HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FRANZ MAISH,

    Plaintiff,

  v.

JANET NAPOLITANO, in her capacity as Secretary of the Department of Homeland Security,

    Defendant.

CASE NO. C12-581RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on Plaintiff's motion for partial summary judgment and Defendant's motion for summary judgment. Plaintiff requested oral argument, Defendant did not. The court finds oral argument unnecessary. For the reasons stated below, the court DENIES Plaintiff's motion (Dkt. # 28), GRANTS in part and DENIES in part Defendant's motion (Dkt. # 33), and sets a new deadline for motions in limine as the parties prepare for trial on November 18.

## II. BACKGROUND

Franz Maish completed four combat tours in Iraq and Afghanistan as a soldier in the United States Army. After his honorable discharge in 2006, he found work as an agent of United States Customs and Border Protection ("CBP"), an agency within the

ORDER – 1

Department of Homeland Security.[1]  He served as an agent on the Mexican border from August 2007 to July 2008, when he resigned to move to the Puget Sound area.

He eventually sought work at CBP again, applying for both a border patrol agent position and a customs and border protection officer position.  Speaking roughly, border patrol agents patrol the border, whereas protection officers work at ports of entry and inspect people and goods coming into the United States.  By May 2009, he had received tentative employment offers for both positions along the Canadian border.  Those tentative offers, from CBP's Minneapolis Hiring Center, informed Mr. Maish that he had to complete aptitude tests, medical examinations, drug tests, and various other requirements.  Assuming he did so successfully, the agency would place him in a position when one opened.  The Minneapolis Hiring Center was responsible for shepherding Mr. Maish through the qualification process.

Mr. Maish suffers from mental illness.  He was first diagnosed with post-traumatic stress disorder ("PTSD") in May 2008 at a Department of Veterans Affairs ("VA") hospital in San Diego, while he still worked as a border patrol agent.  In May 2009, the VA rated him a 40% disabled veteran, a percentage it attributed largely to his PTSD, but in smaller part due to degenerative disc disease and tinnitus.

The parties dispute when Mr. Maish first informed CBP of his mental illness.  He declares that he notified CBP as soon as he received his VA disability rating in May 2009 and again in July 2009.  Gweneth Wild, a human resources officer at the Minneapolis Hiring Center, declares that CBP did not receive notice of his VA rating until February 2010.  There is no dispute that Mr. Maish did not disclose a mental health condition or any mental health treatment in a medical questionnaire that he submitted to CBP in October 2008, even though the questionnaire asked if he had "ever been treated for a mental condition?".

---

[1] Mr. Maish named only the Secretary of the Department of Homeland Security as a Defendant. For clarity, the court will refer CBP as the Defendant throughout this order.

ORDER – 2

1    In March 2010, the Minneapolis Hiring Center sent Mr. Maish a request for
2 information. It acknowledged receipt of the VA disability rating, and requested
3 additional information about each of the conditions the rating disclosed. As to PTSD, it
4 requested a current mental health evaluation, a copy of all treatment records, and a form
5 certifying that he met "Practical Exercise Performance Requirements."[2]
6    A few weeks later, Dr. Matthew Jakupcak, a psychologist at a Puget Sound VA
7 clinic, provided an evaluation in response to CBP's request. The evaluation explained
8 that Dr. Jakupcak had treated Mr. Maish weekly since July 2008 (when Mr. Maish moved
9 to the Puget Sound area). Mr. Maish's initial diagnoses were PTSD, major depressive
10 disorder, and alcohol abuse. Dr. Jakupcak explained that he had also reviewed medical
11 records from other VA providers, including records of a three-day "voluntary stay" in the
12 VA's "Evaluation and Brief Treatment PTSD Unit" in December 2009. Dr. Jakupcak
13 observed that Mr. Maish's PTSD symptoms had "markedly improved relative to the
14 severity observed at the onset of engaging in treatment," and that his symptoms were
15 "generally stable and well managed through behavioral skills and prescribed
16 medications." Similarly, his "depressive symptoms" had "generally improved" and were
17 "stable and well managed . . . ." He explained that although Mr. Maish reported "patterns
18 of alcohol abuse prior to seeking treatment," and had reported "brief relapses into
19 problematic use of alcohol while in treatment," he had been able to quickly address any
20 relapses. He reviewed a summary of skills required for both of the CBP positions for
21 which Mr. Maish had applied, and he saw "no reason why [Mr. Maish] would not be able
22 to successfully perform these tasks." He opined that Mr. Maish's coping skills had
23 improved markedly since he first worked as a border patrol agent. Although he
24 recommended continued treatment, he concluded that Mr. Maish's "treatment gains and

---

[2] The "Practical Exercise Performance Requirements" appear nowhere in the record. Two medical providers certified that Mr. Maish met the requirements, whatever they might be. CPB raised no dispute about these certifications.

ORDER – 3

current ability to use behavioral skills suggest that his symptoms will be manageable and will not be significantly exacerbated while completing job related duties."

When Ms. Wild received Dr. Jakupcak's evaluation, she forwarded it to a contractor whom CBP used for psychiatric evaluations. One of the psychiatrists who worked for the contractor, Dr. Paul Prunier, wrote a brief response to Ms. Wild. He indicated that he had reviewed "about 45 pages of information," although he largely did not explain what those pages were. He did not speak with Mr. Maish, nor did he request any additional information. It is plain that he reviewed Dr. Jakupcak's 6-page report, and just as plain that he found it unpersuasive. He concurred in Dr. Jakupcak's diagnoses (including a diagnosis of bereavement arising from the recent death of Mr. Maish's father), but not his evaluation of Mr. Maish's fitness for work. He claimed that Dr. Jakupcak "seem[ed] to ignore information presented in her [*sic*] own report." The only example he cited, however, was Dr. Jakupcak's failure to provide additional information on Mr. Maish's 3-day December 2009 stay in a VA PTSD evaluation unit. He observed that Dr. Jakupcak had not clarified when Mr. Maish's relapses into alcohol abuse had occurred, and concluded that "one must therefore assume continued relapses to the present." His critical conclusion was as follows:

> Current, active and severe symptoms of PTSD, depression and alcohol abuse could easily impact on the safe and efficient performance of the duties of a Border Patrol Agent and of a Customs and Border Protection Officer as noted in the position descriptions and would disqualify an applicant for acceptance to these positions. The fact that this applicant' recent state is either unclear or perhaps even unstable prevents an affirmative response to this application.

He recommended that CBP not hire Mr. Maish. He did not rule out future employment. He recommended that if Mr. Maish reapplied, that he "submit himself for a 'second-opinion' evaluation preferably by a forensic psychologist or psychiatrist," and that he provide a complete medical record.

Dr. Prunier's opinion spelled doom for Mr. Maish's future at CBP. On April 2, Ms. Wild wrote Mr. Maish, parroted Dr. Prunier's conclusion, and informed him that

ORDER – 4

"based on all of the information available to me, . . . you do not meet the medical standards for the Border Patrol Agent and Customs and Border Protection Officer positions . . . ." She explained that all other medical issues (including issues related to Mr. Maish's back problems and his tinnitus) had been resolved. Her letter suggests no reason for her decision other than Dr. Prunier's opinion. In any event, Ms. Wild confirmed at her deposition that Dr. Prunier's opinion was the sole reason for her decision. Fiorito Decl. (Dkt. # 29), Ex. B (Wild dep. at 24-25). She agreed that her policy was to defer to the medical reviewer CBP hired "in all cases." *Id.* (Wild Dep. at 21). She also agreed that she would have deferred to Dr. Prunier regardless of what Dr. Jakupcak or any other medical provider offered. *Id.* There is no question that Mr. Maish lost his chance at a CBP job solely because of Dr. Prunier's two-page evaluation.

Mr. Maish requested a waiver of CBP's medical requirements. Ms. Wild promptly informed him that a waiver review board had denied his request. The parties have offered no record of the waiver board's reasoning. Mr. Maish sought review of the decision through the federal Office of Personnel Management ("OPM"). OPM affirmed the decisions in two brief letters in July and August 2010. Mr. Maish also filed a complaint of disability discrimination with the Equal Employment Opportunity Commission ("EEOC"), which resulted in a decision from an administrative law judge in February 2011 granting summary judgment to CBP. Mr. Maish appealed that decision to the EEOC; the EEOC affirmed the judge in January 2012.

Mr. Maish filed this suit in April 2012. He contends that CBP discriminated against him on the basis of a disability in violation of Title I of the Americans with Disabilities Act (42 U.S.C. §§ 12111-12117, "ADA"), the Rehabilitation Act of 1973 (29 U.S.C. §§ 791-794f) and the Washington Law Against Discrimination (RCW Ch. 49.60, "WLAD"). Now before the court is Mr. Maish's motion for partial summary judgment, in which he asks solely for a ruling that CBP violated the Rehabilitation Act. CBP seeks summary judgment against all of Mr. Maish's claims.

ORDER – 5

### III.   ANALYSIS

On motions for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in resolving purely legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

**A.   Mr. Maish Has No Valid ADA or WLAD Claim.**

The court quickly dispenses with Mr. Maish's ADA and Washington-law claims, which CBP has asked the court to dismiss. Mr. Maish concedes that although the Rehabilitation Act incorporates ADA standards, § 501 of the Rehabilitation Act (29 U.S.C. § 791) is the sole means to remedy disability discrimination by a federal employer. *See* 42 U.S.C. § 12111(5)(B)(i) (declaring that the federal government is not an "employer" for purposes of the ADA); *Newland v. Dalton*, 81 F.3d 904, 906 (9th Cir. 1996) (noting that § 501 incorporates ADA standards); *Johnston v. Horne*, 875 F.2d 1415, 1420-21 (9th Cir. 1989) (concluding that § 504 of Rehabilitation Act provides no cause of action against a federal employer). He makes no attempt to defend his WLAD claims, and in particular makes no argument that the United States has waived its sovereign immunity with respect to WLAD claims. The court dismisses Mr. Smith's ADA claims because the ADA does not apply to federal employers, and dismisses his WLAD claim for lack of subject matter jurisdiction. *United States v. Sherwood*, 312 U.S.

ORDER – 6

584, 586 (1941) ("The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.") (internal citations omitted).

B.   **A Jury Must Decide Mr. Maish's Rehabilitation Act Claim.**

   1.   **Mr. Maish's Prima Facie § 501 Case**

To state a prima facie § 501 case, a plaintiff must "demonstrate that (1) she is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of her disability." *Walton v. United States Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007). Both disparate treatment of a disabled person and refusal to make a reasonable accommodation for a disabled person are actionable. *See Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002). A plaintiff need only demonstrate that her disability was a "motivating factor" behind the discrimination. *See* 29 U.S.C. § 791(g) (adopting ADA standards for claims under § 501 of the Rehabilitation Act); *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005) (holding that "a motivating factor standard is the appropriate standard for causation in the ADA context"). CBP erroneously cites precedent applicable to § 504 cases, which require disability to be the sole factor motivating an adverse action. Def.'s Mot. (Dkt. # 33) at 15.

   a.   **CBP Regarded Mr. Maish as Disabled, and Withdrew Its Tentative Offer of Employment As a Result.**

Mr. Maish has established two elements of his prima facie case as a matter of law: he has a disability within the meaning of the Rehabilitation Act; and CBP withdrew its employment offer as a result of that disability. The ADA standards incorporated into § 501 define a disability as a "physical or mental impairment that substantially limits one or more major life activities," or a "record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C); *Walton*, 492 F.3d at 1005 (applying ADA standard to Rehabilitation Act claim).

ORDER – 7

Mr. Maish easily establishes that CBP regarded him as having a disability. The court need not discuss whether he had a qualifying impairment or a record of a qualifying impairment. The ADA explains that a person is regarded as disabled if she establishes that "she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Ms. Wild's April 2010 letter deeming Mr. Maish ineligible for the CBP positions is a bald admission that she regarded Mr. Maish as disabled:

> Regarding your history of post-traumatic stress disorder, our consulting mental health specialist [Dr. Prunier] reviewed the information you submitted and recommended you not be hired. His concerns include that current, active and severe symptoms of post-traumatic stress disorder, depression, and alcohol abuse could easily impact the safe and efficient performance of the duties of a Border Patrol Agent and of a Customs and Border Protection Officer.

Later in the letter, she stated that CBP was withdrawing its tentative offer of employment "based on the above issue(s)," although the singular "issue" she mentioned was Dr. Prunier's assessment of Mr. Maish's mental health. No reasonable jury could fail to find that Mr. Maish has proven that the CBP regarded him as disabled and disqualified him from employment as a direct result.

### b. A Jury Could Reach Different Conclusions About Whether Mr. Maish Was "Otherwise Qualified" for the CBP Jobs.

A jury must decide whether Mr. Maish met CBP's medical standards, or, more accurately, its medical standards pertaining to mental health conditions. The court assumes, purely for purposes of this order, that CBP's mental health standards are legitimate restrictions dictated by the demands of the jobs for which Mr. Maish was applying, as opposed to proxies for disability discrimination. *See* 42 U.S.C. § 12112(b)(6) (prohibiting use of "qualification standards . . . or other selection criteria that screen out or tend to screen out an individual with a disability . . . unless the standard . . . or other selection criteria, as used by the covered entity, is shown to be job-related for

ORDER – 8

the position in question and is consistent with business necessity"); 42 U.S.C. § 12113(a) (establishing that employer can prove, as a defense to disability discrimination, that its qualification standards are "job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation").  Even under that assumption, a jury could find that Mr. Maish met CBP's standards.

Both the border patrol agent and customs and border protection officer positions required Mr. Maish to carry a weapon.  Homeland Security mental health standards applicable to any weapons-carrying position state as follows:

> Any disorder which affects normal perceptual judgment and safe and acceptable behavior, or if there is evidence of a serious mental impairment, is generally disqualifying.  Cases will be reviewed on a case-by-case basis.

Mittet Decl. (Dkt. # 34), Ex. 7 at 17.  The standards list major depression as a specific disorder "that may be disqualifying," but note that other "psychiatric disorders" may also be disqualifying, after a case-by-case review. *Id.* at 17-18.  Standards specifically applicable to the border patrol agent position merely reproduce the mental health standards applicable to all weapons-carrying officers. *Id.*, Ex. 14 at 14-15.  Standards specifically applicable to the customs and border protection officer position state that "psychiatric, psychological or emotional difficulties" may be disqualifying. *Id.*, Ex. 5 at 1.  The standards elaborate on what makes a condition disqualifying:

> [A] condition is determined to be disqualifying if it is likely to affect safe and efficient job performance or if it is likely to endanger the health and safety of the individual, others, or national security.  It is disqualifying if the individual fails to demonstrate that the condition is well stabilized, is unlikely to recur and that he/she is unlikely to experience sudden or subtle incapacitation while executing the position's duties.

*Id.*

A reasonable jury could conclude that Mr. Maish met all applicable mental health standards.  The standards do not mandate that every mental health condition (even a "listed" condition like major depressive disorder) is disqualifying.  They instead mandate a case-by-case inquiry into whether the condition is likely to impact job performance.  A

ORDER – 9

jury considering those standards could credit evidence that Mr. Maish had previously worked as a border patrol agent without incident.  It could credit the evidence from Dr. Jakupcak, Mr. Maish's treating physician, that his mental health conditions were stable and would not interfere with his job performance.  It could discredit Dr. Prunier's two-page opinion, which was based on little more than a review of Dr. Jakupcak's report with no effort to follow up.  It could conclude that there was no basis for Dr. Prunier to transform Dr. Jacupcak's assessment of well-controlled mental health into an assessment of "[c]urrent, active, and severe symptoms of PTSD, depression, and alcohol abuse," a conclusion that Ms. Wild repeated verbatim.  It could conclude that by deferring to Dr. Prunier without further inquiry, CBP abandoned its responsibility to conduct a case-by-case inquiry into the employability of applicants with mental health conditions.

A jury could also conclude that Mr. Maish did not meet those standards.  It might, for example, query whether Mr. Maish's 3-day stay in a VA PTSD unit in December 2009 was a cause for concern.  There is no evidence in the record that explains that stay.  A jury might conclude that an unspecified number of relapses of alcohol abuse was a reason to disqualify Mr. Maish.  A jury also might conclude that Dr. Jakupcak inappropriately minimized the risks that Mr. Maish's conditions presented.

### 2.     Application of the McDonnell Douglas Standard

In employment discrimination cases, including claims invoking § 501 of the Rehabilitation Act, the *McDonnell Douglas* burden-shifting analysis augments the summary judgment standard.  *Sisson v. Helms*, 751 F.2d 991, 993 (9th Cir. 1985) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Kim v. Potter*, 474 F. Supp. 2d 1175, 1186 (D. Haw. 2007) (applying *McDonnell Douglas* to § 501 claim); *Wilborn v. Ashcroft*, 222 F. Supp. 2d 1192, 1207 (S.D. Cal. 2002) (same).  The path that *McDonnell Douglas* charts requires a plaintiff hoping to avoid summary judgment to establish a prima facie case of discrimination; if she succeeds, the burden shifts to the defendant to produce evidence of a lawful motive for its action; if the defendant

ORDER – 10

succeeds, the plaintiff must produce evidence that the defendant's proffered motive is pretext. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003). The burden-shifting path, however, is not mandatory:

> A plaintiff does not, however, have to rely on the *McDonnell Douglas* approach to create a triable issue of fact regarding discriminatory intent in a disparate treatment case. . . . Instead, he may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant and that the defendant's actions adversely affected the plaintiff in some way.

*Pac. Shores Props., LLC v. City of Newport Beach*, No. 11-55460, 2013 U.S. App. LEXIS 19386 (9th Cir. Sept. 20, 2013) (internal quotation omitted).

In this case, there is no need to take the *McDonnell Douglas* approach, even though it would be of no benefit to CBP. Mr. Maish relies on direct evidence of disability discrimination. There is no dispute about why CBP withdrew its employment offers. It admittedly did so solely because of Mr. Maish's mental health conditions.[3] There is no question of pretext, only a question of whether CBP properly concluded that Mr. Maish did not meet its medical standards, and perhaps a question of whether those medical standards were "job-related and consistent with business necessity," as the Rehabilitation Act requires.[4] For the reasons stated above, the court leaves those questions to the jury.

---

[3] At various times, CBP officials (and its counsel in this case) have contended that Mr. Maish acted dishonestly in failing to sooner disclose his mental health conditions. Mr. Maish contends that he did not disclose them sooner in reliance on Department of Justice guidance that veterans need not disclose their combat-related mental health conditions. The court suggests no opinion on who has the better of this argument, because it appears to be wholly irrelevant. CBP did not withdraw its employment offers because Mr. Maish was not forthcoming, it withdrew its offers because of his mental health conditions.

[4] As the court previously noted, its disposition today does not require it to decide if CBP's medical restrictions satisfy a "business necessity" test. In any event, the court would have been unable to do so as a matter of law. If CBP applies its medical restrictions as they are written, which is to say that it applies them as a mandate to conduct a case-by-case inquiry to determine if a mental health condition will interfere with job performance, then they are likely valid. If CBP merely gives lip service to the letter of its restrictions, and disqualifies any applicant diagnosed with a mental health condition, then that practice (which effectively replaces the restrictions as written) is invalid. A jury must decide these issues.

ORDER – 11

## IV.   CONCLUSION

For the reasons stated above, the court DENIES Mr. Maish's motion for partial summary judgment. Dkt. # 28.  The court DENIES CBP's motion for summary judgment (Dkt. # 33) except that it dismisses Mr. Maish's ADA and WLAD claims.

The court previously suspended the deadline for submission of motions in limine. The parties shall file motions in limine in accordance with Local Rules W.D. Wash. LCR 7(d)(4) no later than October 30, 2013.  The court orders the parties to note those motions for November 15, and to file any opposition to the motions no later than November 12.  All other deadlines shall remain as stated in the court's July 8, 2013 minute order setting the trial date and related dates.  Dkt. # 24.

In all future submissions in this case, the parties shall discontinue their practice of citing the precedent of courts other than the Ninth Circuit or Supreme Court where there is binding precedent on point.  The parties may cite out-of-circuit authority, of course, but they may not do so to the exclusion of citing authority that binds this court.

Dated this 24th day of October, 2013.

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 12